FILED '11 MAR 08 12:05 USDC-ORE

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

MICHAEL DUANE SENTER,                                    01-1814-TC

                        Petitioner,

            v.                          FINDINGS AND RECOMMENDATION

STAN CZERNIAK, Superintendent of the
Oregon State Penitentiary,

                        Respondent.

COFFIN, Magistrate Judge:

      State prisoner Michael Duane Senter (petitioner), who is represented by counsel, filed a pro

se habeas petition under 28 U.S.C. § 2254 on December 17, 2001. Petitioner seeks federal habeas

relief claiming his sentence violates state law, he received ineffective assistance of counsel, and the

trial court erred. For the reasons set forth below, I recommend that the court deny the petition.

### **Background**

      Petitioner and his friends were heavily involved in criminal activity. Most had criminal

convictions ranging from armed robbery to forgery and were involved in selling and using drugs,

Page 1 - FINDINGS AND RECOMMENDATION

including cocaine and methamphetamine. From all accounts, petitioner and his girlfriend Angela

Wagner (known as Twy) had a violent and unpredictable relationship. Twy disappeared during their

relationship. Approximately two years after Twy's disappearance, the state acted on information

provided by petitioner's friend Eddie Kennon and indicted petitioner on charges stemming from two

incidents in which he allegedly shot at Twy, the second time fatally. The following is a summary

of the evidence presented at the trial.

Kennon testified that, in early 1992, petitioner drove into Kennon's driveway and parked.

Twy jumped out of the passenger side of the car and accused petitioner of trying to kill her.

Petitioner, who had a gun with him, told Kennon that he should have killed Twy. Kennon noticed

the car's passenger side window was gone and glass was everywhere. (Tr.[1] 237-41). Tobie

Buchanan's[2] testimony supported Kennon's version of events. According to Buchanan, she had

been riding in petitioner's car with him, Twy, and Kennon when she noticed glass covering the back

seat. Buchanan asked what had happened. Kennon replied that, during an argument, petitioner had

pulled a gun and tried to shoot Twy in the head. Petitioner "kind of laughed" after Kennon's

statement. (Tr. 156-59).

About a month after Buchanan asked petitioner about the broken glass in his car, petitioner

and Twy borrowed Buchanan's van to pick up some drugs. Petitioner was only supposed to use the

van for about an hour. Buchanan recalled that petitioner took the van in mid-afternoon because she

had to pick up her son from school; thus she was very concerned that petitioner return the van on

---

[1]The transcript is filed as dkt. #'s 21 and 22.

[2]The record refers to Buchanan by several different names: Tobie/Tobi Schance, Tobie
Sanchez Buchanan and Tobie Buchanan.

time. When petitioner was late returning the van, Buchanan called Kennon for help. About twelve

hours later, Kennon called Buchanan to say that petitioner would return the van in three days. When

petitioner returned the van three days later Buchanan noticed it had been cleaned; the trash she had

left in the van and the block of wood she used to reach the gas pedal were gone. Petitioner told

Buchanan he had cleaned the van because he kept it so long. (Tr. 142-47).

Twy was not with petitioner when he returned the van, so Buchanan asked where she was.

Buchanan testified that petitioner said that, during an argument, Twy had jumped out of the van at

a red light and he had not seen her since. Buchanan also asked petitioner about a dent in the van's

door and a hole in the door post which had not been there before she loaned the van to him.

Petitioner explained the dent and hole by saying that, during the argument, Twy had grabbed his gun

and shot at him. A few days later, Buchanan found a "mushroomed out slug" in the van, and she

asked petitioner if he had killed Twy. Instead of answering, petitioner asked Buchanan: "do you

think I did?" Buchanan did not answer and dropped the matter. (Tr. 146-52). Several months later,

Buchanan saw Twy's clothing in a storage locker and also saw a ring that she recalled Twy wearing

the day she and petitioner borrowed the van. (Tr. 165-67).

Kennon testified about what happened the night petitioner borrowed Buchanan's van. When

Buchanan called him for help locating the van, Kennon initially thought that petitioner and Twy had

"taken off." Then, Kennon received several pages from petitioner around 3:30 AM the next

morning. Kennon went to meet petitioner at a Jubitz truck stop. When petitioner got out of

Buchanan's van, Kennon noticed he was high on speed, carrying a pistol in his waistband, and

covered with what Kennon thought was paint or grease. Kennon stated that petitioner told him: "I

really fucked up this time." By way of explanation, petitioner opened the van's passenger door.

Page 3 - FINDINGS AND RECOMMENDATION

Kennon looked in and saw Twy kneeling on the floor with half her head missing. Petitioner asked Kennon to help him get a shovel, some lye, and a change of clothes. (Tr. 244-54, 322).

Later, when Kennon and petitioner were driving past a 7-11, petitioner told Kennon "that's where I did it" and described shooting Twy during an argument. In exchange for his cooperation during petitioner's trial, Kennon was promised concurrent sentences on federal and state changes pending against him. Additionally, he was not prosecuted as an armed career criminal, which would have resulted in a 360 month prison sentence with a mandatory 180 month minimum. (Tr. 285-86, 305).

A third witness, Van Clyde Elrod III, who also knew petitioner and Twy, testified that sometime after Twy disappeared, he and petitioner were riding together in a car. During the trip, petitioner expressed concern that Kennon knew he had killed Twy. Petitioner explained his reason for killing Twy was that he was worried she was going to "tell on him for something." According to Elrod, petitioner described the first time he tried to shoot Twy and said that he "thought she would have learned something from the first time [he] shot at her." (Tr. 399-402).

In May 1993, based on information provided by Kennon, investigators went to the Foster U-Pull-It wrecking yard and located Buchanan's van. The van was sitting outside on blocks. Its wheels and tires had been removed, the cargo door was standing open, and the rear cargo doors and the right passenger door were missing. The driver's seat, engine cover, and an interior door panel to the right passenger door were all lying loose beside the van. The wrecking yard did not know what parts had been removed or who had looked at the van while it sat in the yard. Over defense objections, the van parts were introduced into evidenced at trial. The van itself, however, was destroyed before trial. (Tr. 521-22, 525-26, 528, 549).

Page 4 - FINDINGS AND RECOMMENDATION

Testing of the van parts showed human blood on the passenger seat of the van, but DNA testing was inconclusive as to whether it was Twy's. (Tr. 598-99, 608-21, 657). Investigators also found a tooth fragment imbedded in the foam inside the seat. (Tr. 604-05). Experts testified that the tooth was from a human and its condition was consistent with having been blown out of a mouth by the impact of a bullet. (Tr. 90, 95).

The jury convicted petitioner of attempted assault in the first degree, attempted murder, and manslaughter in the first degree. The trial court sentenced petitioner to 60 months imprisonment for the attempted assault in the first degree, to a concurrent 100 month term for attempted murder, and to a consecutive term of 240 months for manslaughter in the first degree–resulting in a total sentence of 340 months. With regard to the manslaughter conviction, the sentencing court found that the harm involved was greater than typical for such an offense, and imposed an upward departure. The court based the upward departure on six factors: (1) the degree of harm or loss was greater than typical for manslaughter; (2) petitioner did not reveal the location of Twy's body; (3) repeated terms of imprisonment and community supervision had not deterred petitioner from committing new crimes; (4) petitioner was under supervision by Multnomah County's community corrections at the time of the offense; (5) petitioner had persistently been involved in similar offenses; and (6) petitioner had shown no remorse. (dkt. #20, ex. 101).[3]

Petitioner challenged the upward sentencing departure for the manslaughter sentence on direct appeal and in post-conviction proceedings. The Oregon Court of Appeals and Oregon Supreme Court denied petitioner's direct appeal without opinion. (dkt. #20, exs. 106, 107). The

---

[3]The pages in this exhibit are not numbered. The disposition on count 3 is marked with "Judgement of Conviction and Sentence" at the lower left and "Page 3 of 4" on the bottom right.

Page 5 - FINDINGS AND RECOMMENDATION

state post-conviction court denied relief, except that it reduced petitioner's sentence on the manslaughter conviction from 240 months to 230 months, resulting in a total sentence of 330 months (twenty seven years).    The Oregon Court of Appeals and the Oregon Supreme Court denied petitioner's post-conviction appeals without opinion.  Petitioner then filed the instant federal habeas petition.

After petitioner's federal claims were fully briefed and ready for disposition, the court stayed this case to allow petitioner to exhaust his Blakely[4] claims in state court.  (dkt. #62).  Petitioner's state court proceedings have concluded and the parties have filed supplemental briefing and exhibits. (dkt. #s 71, 72 and 73).

## **Legal Standard**

Rule 2 of the Rules Governing Habeas Corpus Action establish that a habeas petition must specify all the grounds for relief available to the petitioner. See e.g.,  Mayle v. Felix, 545 U.S. 644, 654 (2005) (stating that habeas proceedings brought by state prisoners are governed by a discrete set of rules).  Compliance with Rule 2 requires a habeas petitioner to state specific, particular facts which entitle him to habeas relief for each ground specified.  Adams v. Armontrout, 897 F.2d 332, 334 (8th Cir. 1990). Numerous courts have "repeatedly expressed their unwillingness to sort through voluminous documents filed by habeas corpus petitioners in order to divine the grounds or facts which allegedly warrant relief." Id. at 333.

State courts judges are the federal courts' co-equals in the protection of federal constitutional rights. Robb v. Connolly, 111 U.S. 624, 637 (1884) ("Upon the state courts, equally with the courts

---

[4]In Blakely v. Washington, 542 U.S. 296 (2004) the Supreme Court found that a defendant had a right to fact finding by a jury at sentencing.

of the Union, rests the obligation to guard, enforce, and protect every right granted or secured by the

constitution of the United States."). Although Congress has granted federal courts the authority to

grant habeas corpus relief to state prisoners, due consideration of the federal courts' circumscribed

role counsels prudent restraint in exercising that power to second guess state courts. See e.g., 28

U.S.C. § 2254. Specifically, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),

28 U.S.C. § 2254, precludes habeas relief for petitions filed after its effective date unless the

petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); see also Coleman

v. Thompson, 501 U.S. 722 (1991). For claims decided on the merits, federal habeas relief is

available only if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

different. The Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state
> court applies a rule different from the governing law set forth in our cases, or if it
> decides a case differently than we have done on a set of materially indistinguishable
> facts. The court may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from our decisions but
> unreasonably applies it to the facts of the particular case. The focus of the latter
> inquiry is on whether the state court's application of clearly established federal law
> is objectively unreasonable, and we stressed in Williams v. Taylor, 529 U.S. 362, 120
> S.Ct. 1495, 146 L.Ed.2d 389 (2000) that an unreasonable application is different
> from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law

set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to

Page 7 - FINDINGS AND RECOMMENDATION

cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002). When considering whether the law applied to a claim by the state courts was contrary to, or an unreasonable application of, the law set forth by the United States Supreme Court, a court should look to the last reasoned state court decision. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir.2002), cert. dismissed, 538 U.S. 919 (2003).

## Discussion

Petitioner argues that he is entitled to habeas relief on two grounds. In his first ground for relief, he argues that the trial court "abused its discretion when it sentenced [him] contrary to state sentencing laws outside guidelines." (ground 1). His second ground for relief references a few pages of his brief to the Oregon Supreme Court, which he attached to his federal petition. Petitioner's second ground raises claims of ineffective assistance of counsel–specifically that his trial and appellate counsel were ineffective for various reasons (ground 2, claims 1 and 2), and a claim of trial court error. (ground 2, claim 3). Respondent asserts that the Sixth Amendment and Fifth Amendment consecutive sentence claims in ground 1[5] and the trial court error claims in ground 2, claim 3 are procedurally defaulted because they were not properly raised before the post-conviction court and, even if they are not defaulted, should be denied on the merits.

Petitioner's supplemental briefing raises two claims not included in his habeas petition: (1) that the state failed to correct his sentence to reflect the relief granted in his state post-conviction relief proceedings–a reduction in the upward departure on sentence imposed on the manslaughter conviction from 240 months to 230 months (dkt. #71 at 2); and (2) that the trial court violated

---

[5]Respondent concedes that petitioner has exhausted his 5th Amendment upward sentence departure claim in ground 1. (dkt. #53 at 7).

petitioner's Sixth and Fourteenth Amendment rights by a judge instead of a jury making findings supporting an upward departure to petitioner's sentence and by a conviction on the manslaughter charge by a ten-to-two verdict. (dkt. #71 at 4-7).

## I.    New Claims for Relief Raised in Petitioner's Supplemental Briefing

Petitioner's claims raised for the first time in supplemental briefing do not comport with Rule 2's requirements that a habeas petitioner specify the grounds for relief available to him in his petition. I find these claims are not properly before the court, and I have not considered these claims.[6]

## II.    Exhaustion and Procedural Default

As noted above, federal courts must give the state courts the first chance to resolve state prisoners' habeas claims; thus exhaustion is a prerequisite to filing a federal habeas claim. 28 U.S.C. § 2254(b). To properly exhaust, state prisoners must give state courts a "full and fair opportunity to act on their claims," which means "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999). A petitioner fairly presents his claim by describing the operative facts and the federal legal theory on which the claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. Anderson v. Harless, 459 U.S. 4, 6 (1982). "[T]he Petitioner must refer to federal law in state court explicitly [but] exhaustion is satisfied once the Petitioner makes that explicit reference even if Petitioner relies predominantly on state law before the state courts." Insyxiengmay v. Morgan, 403 F.3d 657, 668 (9th Cir.2005). The fair presentation requirement is not met if the state's

_____

[6]I note that the record shows that respondent has amended petitioner's "facesheet" to reflect the relief granted by the state post-conviction court. (dkt. #73, ex. 153).

Page 9 - FINDINGS AND RECOMMENDATION

highest court does not reach the merits of a claim due to the procedural context in which it was presented. Roettgen v. Copeland, 33 F.3d 36, 38 (9th Cir.1994).

Failure to exhaust a claim in state court constitutes a procedural default. When a petitioner has defaulted on a procedural requirement and is unable to demonstrate cause and prejudice or a fundamental miscarriage of justice, a district court need not reach the merits of the federal habeas petition. Park v. Cal., 202 F.3d 1146, 1150 (9th Cir.2000).

Respondent contends that petitioner has failed to exhaust his ground 1 Sixth Amendment claim and Fifth Amendment claim regarding consecutive sentence imposition because these claims were not presented to the state court.

The record establishes that petitioner failed to present these claims to the Oregon Supreme Court either on direct appeal or in his post-conviction relief claim. (dkt. #20, exs. 105, 110, 131, 133). There is no mention of a Sixth Amendment claim in petitioner's state court filings. The Fifth Amendment claim articulated to the Oregon Supreme Court focused on the upward departure imposed on the Manslaughter I conviction and is devoid of any argument concerning the consecutive nature of the sentence. For example, the petition for direct appeal states that the trial court violated petitioner's Fifth Amendment rights against self-incrimination by considering petitioner's failure to disclose the location of the body, among other factors, when increasing his sentence. (dkt. #20 at ex. 105). I observe that the post-conviction court's decision, which was prepared by the state for the post-conviction court's signature, concludes that "[t]he court had authority to impose consecutive sentences for convictions arising from incidents that did not arise out of the same court of conduct. The convictions for which petitioner received consecutive sentences did not arise from the same course of conduct." (dkt. #20, ex. 133 at 7). I cannot find, however, that mention of a claim in the

Page 10 - FINDINGS AND RECOMMENDATION

findings and conclusions of a post-conviction court constitutes a "full and fair" presentation of the claim to the state's highest court; especially when the record shows that this claim was not articulated by petitioner in either his state petitions for direct or post-conviction relief. Anderson, 459 U.S. at 6.

In ground 2, claim 3, petitioner claims that the trial court erred in several ways, including denying his motion in limine regarding excluding van parts from evidence. The record establishes that the state court found that these claims were procedurally barred and did not consider them on the merits. Specifically, the post-conviction court found that "[p]etitioner could have raised the issues against the trial court he raised in the underlying appeal" (dkt. #20, ex. 133 at 6 ¶ 17) and concluded that the claims of trial court error were "barred by Palmer v. State of Oregon, 318 Or 352 (1994), Lerch v. Cupp, 9 Or App 508 (1972), and Hunter v. Maass, 106 Or App 438 (1991)." Id., ex. 133 at 8). In Palmer, the Oregon Supreme Court held that a defendant could not assert a ground that could have been and was not raised at trial in underlying criminal proceedings as a ground for post-conviction relief. Palmer, 318 Or.at 356. Because petitioner's claims of trial court error were denied on procedural grounds, the fair presentation requirement is not met. Roettgen, 33 F.3d at 38.

I find that petitioner procedurally defaulted his ground 1 Sixth Amendment and Fifth Amendment consecutive sentence claims and his ground 2, claim 3 trial court errors claim and that these claims are barred from federal habeas review.

## III.   Merits

I consider the following grounds for relief on their merits: that the upward departure to the Manslaughter I sentence violated the Fifth Amendment; that petitioner's trial counsel was ineffective; and that petitioner's appellate counsel was ineffective.

Page 11 - FINDINGS AND RECOMMENDATION

A.    **Ground 1: Imposition of a Sentence Contrary to State Law**

The exhausted portion of petitioner's ground 1 claim alleges that the trial court violated the state sentencing laws when it imposed a 240 month "double" departure sentence for manslaughter based on six aggravating factors which were found by the judge, not a jury: (1) degree of harm greater than usual; (2) not revealing the location of the body; (3) repeated terms of imprisonment and supervision had failed to deter crime; (4) on community supervision when crime occurred; (5) persistent involvement in similar offenses; and (6) lack of remorse. (dkt. #20, ex. 101).

According to petitioner, the primary factor motivating the upward sentence departure was his failure to disclose the location of Twy's body. Petitioner maintains that none of the other five factors explain the "draconian" sentence and argues that the trial court's factual findings about petitioner's past criminal history were inaccurate.  Moreover, although allegations suggested petitioner had a history of threatening women, he had never been convicted of any crimes of violence. Petitioner has always maintained his innocence and argues that reliance on this silence concerning the body's location violates his Fifth Amendment rights and is contrary to the Supreme Court's holding in Mitchell v. United States, 526 U.S. 314 (1999). The Mitchell court announced that a defendant who has pled guilty does not waive his right to remain silent at the sentencing hearing and that the sentencing court could not draw an adverse inference from a defendant's silence. Id. at 328-29.  In other words, Mitchell announced a rule that a defendant has a right to have a sentencing court to abstain from making adverse inferences that flow from defendant's failure to testify. Id.

Respondent argues that Teague v. Lane, 489 U.S. 288 (1989) forecloses this court from determining that the Oregon courts committed constitutional error by not finding a Fifth Amendment

Page 12 - FINDINGS AND RECOMMENDATION

violation. In Teague, the Supreme court instructed that the federal courts could not retroactively

impose constitutional rules on state courts which were not compelled by existing precedent when

a habeas petitioner finished raising his claims on direct review.  Id. at 299-316.  Respondent

contends that the rule set forth in Mitchell was not clearly established at the time petitioner's

conviction and sentence became final and does not fall within one of the two exceptions to Teague's

non-retroactivity principle.  Respondent further asserts that this court is bound by the Oregon

Supreme Court's determination that the trial court properly imposed an upward departure on

petitioner's manslaughter sentence because that determination[7] is neither contrary to, nor an

unreasonable application of, state law.  Respondent claims that each of the six factors were valid

reasons to impose an upward departure.  Respondent observes that the trial judge specifically stated

that the factors supporting the sentence departure were based on the evidence presented during trial.

In his supplemental brief, petitioner counters respondent's Teague argument, stating that

the Fifth Amendment's prohibition against self-incrimination was deeply embedded long before the

Supreme Court decided Mitchell.  Thus, it does not announce a new rule.  Further, he contends that,

if a new rule was announced, it is a"bedrock constitutional principle" which is one of the exceptions

Teague's non-retroactivity principle.  Saffle v. Parks, 494 U.S. 484, 495 (1990).

Before considering the merits of petitioner's claim, I consider whether non-retroactivity

principles bar application of Mitchell's holding to this case.  Caspari v. Bohlen, 510 U.S. 383, 389

(1994).  In Teague, the Supreme Court held that, "[s]ubject to two narrow exceptions," Gilmore v.

Taylor, 508 U.S. 333, 339 (1993), that "new constitutional rules of criminal procedure will not be

_____

[7]As noted previously, the post-conviction relief court found that petitioner's argument
regarding the determination the correct gridblock had merit and that the maximum sentence
departure was 230 months.

applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. at 310. A Teague inquiry is a three step process. First, I must ascertain the date petitioner's sentence became final. Caspari, 510 U.S. at 390. Then, I must "[s]urvey the legal landscape as it then existed," Graham v. Collins, 506 U.S. 461, 468 (1993), "to determine whether a state court considering [petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." Saffle, 494 U.S. at 488. Finally, if I determine that petitioner "seeks the benefit of a new rule," I must consider whether the relief sought "falls within one of the two narrow exceptions to [the] nonretroactivity doctrine." Lambrix v. Singletary, 520 U.S. 518, 539 (1997). Thus, to conclude that application of a rule is not barred by Teague, the federal court must determine not only that the rule was "a reasonable interpretation of prior law," or even the "most reasonable" interpretation of prior law, but also that "no other interpretation was reasonable." Id. at 538. Because the Oregon state courts would not have felt compelled by precedent existing on the date petitioner's conviction became final to conclude that the rule against adverse inferences from a defendant's silence at sentencing announced in Mitchell was required by the constitution, the application of the rule is barred by Teague.

Petitioner's conviction became final on March 5, 1997, the last day that petitioner could have appealed the Oregon Supreme Court's decision affirming his conviction and sentence on direct review to the United States Supreme Court. (dkt. #20, ex. 106).

In surveying the legal landscape as it existed on that date, I must determine whether "precedent" would have "compelled" the Oregon courts to conclude that the constitution "required" Mitchell's no-adverse-inference-from-silence rule. Petitioner is correct that the right to remain silent

Page 14 - FINDINGS AND RECOMMENDATION

during criminal proceedings predates the American Revolution. The Latin maxim nemo tenerur se ipsum accusare (no man is bound to accuse himself) was a rallying cry for religious and political dissentients prosecuted in sixteenth century England. U.S. v. Gecas, 120 F.3d 1419, 1444-45 (11th Cir. 1997). "True to its English antecedents, the privilege against self-incrimination in the American colonies was viewed as a limitation on the power of national government to prosecute religious and political heterodoxy." Id. at 1451. Thus, common-law defendants in pre-revolutionary colonial America had an implied privilege against self-incrimination. Id. at 1452.[8]  Although the Fifth Amendment's self-incrimination clause has "little legislative history," its precedents suggest that it was intended "to protect the integrity of the common-law criminal trial against the adoption of inquisitional tactics by the federal government." Id. at 1456. In short, it is well established that a criminal defendant had a right to remain silent–a protection against the "investigative techniques of government, not an individual right against the world." Id. at 1457. What is not as clear, however, is whether an accused had a right to have the tribunal refrain from making adverse inferences which might reasonably flow from silence.

In Barnes v. U.S., 412 U.S. 837, 846 n. 12 (1973), the Supreme Court upheld jury instructions permitting the jury to infer knowledge that property was stolen based on possession of recently stolen property if that possession was not satisfactorily explained. Without comment, the Court stated that this jury instruction could not be understood as a comment on a defendant's failure to testify. Id. Additionally, Justices Scalia, O'Conner, Thomas, and then-Chief Justice Renquist dissented from the majority opinion in Mitchell. The dissent disagreed that the Fifth Amendment

---

[8]It is interesting to note that most indigent criminal defendants in state court were forced to speak in their own defense until 1963. See Gideon v. Wainright, 372 U.S. 335, 344 (1963).

prohibited a sentencer from drawing an adverse inference from a defendant's failure to testify. Mitchell, 526 U.S. at 332-343, Scalia, J. Dissenting. The dissent noted that the Mitchell decision represented a "bizarre-inconsistency" between the rule announced in Mitchell's holding and the "balance of our jurisprudence relating to sentencing in particular. '[C]ourts in this country and in England,' we have said, have 'practiced a policy under which a sentencing judge [can] exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of the punishment to be imposed within limits fixed by law.'" Id. at 338-39 (internal citations omitted).

For Teague purposes, it is of no consequence whether Justice Kennedy or the dissenting Justices in Mitchell arrived at the correct interpretation of whether the Fifth Amendment precludes a sentencer from drawing an adverse inference from silence. What matters is that reasonable jurists such as then-Chief Justice Renquist and Justices Scalia, Thomas, and O'Connor–all of whom are reasonable jurists, could disagree with the majority's opinion. Because these four Justices could interpret the Fifth Amendment as allowing a sentencer to draw a negative inference from silence, I cannot conclude that, at the time petitioner's sentence became final, the Oregon state courts would have been compelled to determine that the constitution prohibited a sentencer from drawing a negative inference from silence. I find that Teague bars the application of the rule announced in Mitchell.

Moreover, even assuming arguendo that Teague did not bar the application of the no-adverse-inference-from silence rule, it is not clear from the underlying record that the sentencing court relied on petitioner's silence in the upward departure. Instead, the sentencing court noted that it based its upward departure on the evidence adduced at trial. In other words, the upward departure based on

Page 16 - FINDINGS AND RECOMMENDATION

petitioner's failure to disclose the location of the body was not based on his silence–or any negative inference from such, at sentencing, but instead on the evidence presented at trial and the jury's determination that petitioner had killed Twy (and thus presumably knew where her body was). In short, nothing, save for petitioner's assertion, establishes that the sentencing court based the upward departure on petitioner's silence. Moreover, any error was harmless as the sentencing court based its upward departure on five other independent aggravating factors. Brecht v. Abrahamson, 507 U.S. 619 (1993).

A review of the record establishes that the decisions of the Oregon Supreme Court on direct and collateral appeal are binding on this court because they are neither contrary to, nor an unreasonable application of clearly established Supreme Court law, as it existed at the time petitioner's conviction and sentence became final. 28 U.S.C. § 2254. The record establishes that the sentence was based on a reasonable determination of the evidence presented at trial and, with the exception noted by the post-conviction court, was within Oregon's sentencing guidelines. Accordingly, I recommend that petitioner's claim in ground 1 be denied.

**B.    Ground 2: Ineffective Assistance of Trial and Appellate Counsel**

Petitioner claims he is entitled to habeas relief because he received ineffective assistance of trial and appellate counsel.

In order to prevail on his claim of ineffective assistance of counsel, petitioner must show two things, an unreasonable error and prejudice flowing from that error. Strickland v. Washington, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of

Page 17 - FINDINGS AND RECOMMENDATION

reasonable professional judgment. Id. at 690. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id. "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697). In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. Miller v. Keeney, 882 F.2d 1428, 1434 n.9 (1989).

Here, the record establishes that the Oregon Supreme Court determined that petitioner's trial counsel was not ineffective. Specifically, the post-conviction court found that: petitioner's counsel did not unreasonably fail to object during the state's witnesses' direct examination; counsel raised appropriate objections during the state's witnesses' direct testimony; because the van was destroyed before petitioner's indictment, counsel did all he reasonably could regarding the examination of the

Page 18 - FINDINGS AND RECOMMENDATION

van itself; counsel acted reasonably in attempting to find a person to explain the bullet holes in the van, even though he could not find such a person; petitioner's counsel competently represented petitioner and was successful in persuading the jury to convict on a lesser charge; and counsel adequately argued against a upward departure. (dkt. #20 at ex. 133 at 3-7). The post-conviction court also found that petitioner was not denied the right to counsel as articulated by Strickland and guaranteed by the federal and Oregon state constitutions. Id. at 8.

After a careful review of the record and petitioner's briefing, I find that the Oregon Supreme Court's determination that petitioner's trial counsel was not ineffective is not contrary to, or an unreasonable application of, controlling Supreme Court precedent. Nothing in the record rebuts the presumption that petitioner's counsel acted within the wide range of reasonable assistance. Hughes, 898 F.2d at 702. For example, petitioner argues that his counsel should have exposed Buchanan as being on drugs during the trial. The record, however, shows that Buchanan denied using drugs at trial and only after end of the trial submitted an affidavit stating she was, in fact, using drugs during the trial. The record also shows that Buchanan's testimony did not give any indication she was under the influence of drugs. It is hard to see how petitioner's counsel could have ascertained such without an admission from Buchanan.

In hindsight petitioner perhaps wishes that his counsel had acted differently, but petitioner's dissatisfaction with counsel does not render his assistance unreasonable. Further, the post-conviction court found that petitioner did not introduce credible evidence to otherwise explain the crime lab's findings of human blood and a tooth fragment in the van. Thus, even if his trial counsel were ineffective for failing to offer testimony regarding alleged subsequent vandalism of the van or for failing to object during the state's witnesses' testimony, petitioner cannot establish that these errors

Page 19 - FINDINGS AND RECOMMENDATION

prejudiced him.  Strickland, 466 U.S. at 693. Accordingly, I recommend that the court deny petitioner's ground 2 claim that his trial counsel was ineffective.

The record establishes that the post-conviction court found that petitioner was not denied effective assistance of trial counsel. The court found that appellate counsel reasonably did not argue that trial counsel raised issues regarding admissibility of the evidence taken from the van on appeal and reasonably did not assign error to the court's decision not to sever the charges against petitioner. (dkt. #20, ex. 133 at 6). After a careful review of the record, I cannot find that the Oregon Supreme Court's determination is contrary to, or an unreasonable application of, Strickland. Petitioner has not established that his appellate counsel's conduct did not comport with that of reasonable appellate counsel. Hughes, 898 F.2d at 702. Accordingly, I recommend that the court deny petitioner's ground 2 claim for ineffective assistance of appellate counsel.

## **Conclusion**

I recommend that the court deny petitioner's petition for a writ of habeas corpus. I further recommend that, because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability should be DENIED.  28 U.S.C. § 2253(c)(2).

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due no later than fourteen days after the date this order is filed. The parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, any party may file a response within fourteen days after the date the objections are filed. Review of the Findings and Recommendation will go under advisement when

Page 20 - FINDINGS AND RECOMMENDATION

the response is due or filed, whichever date is earlier.

DATED this _____ day of March  2011.

_____
THOMAS M. COFFIN
United States Magistrate Judge